**ORIGINAL**

E-filing

1   Joseph R. Saveri (State Bar No. 130064)
    *jsaveri@lchb.com*
2   Michele C. Jackson (State Bar No. 090807)
    *mjackson@lchb.com*
3   Eric B. Fastiff (State Bar No. 182260)
    *efastiff@lchb.com*
4   Andrew S. Kingsdale (State Bar No. 255669)
    *akingsdale@lchb.com*
5   Lieff Cabraser Heimann & Bernstein, LLP
    275 Battery Street, Suite 3000
6   San Francisco, CA 94111-3339
    Tel: (415) 956-1000
7   Fax: (415) 956-1008

8   *Attorneys for Individual and Representative Plaintiff*
    *Margarita Lacabe*

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14   MARGARITA LACABE, on behalf of          Case No. **CV 09 0402**
     herself and all others similarly situated,
15                                            **CLASS ACTION COMPLAINT**
                     Plaintiffs,
16                                            CLASS ACTION
            v.
17                                            JURY TRIAL DEMANDED
     WALMART.COM USA LLC, WAL-
18   MART STORES, INC., and NETFLIX,
     INC.,
19
                     Defendants.
20

21

22          Plaintiff Margarita Lacabe ("Plaintiff") brings this Complaint under Sections 1 and

23   2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton

24   Antitrust Act of 1914, 15 U.S.C. §§15 & 26, for treble damages and injunctive relief against

25   Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC

26   ("Walmart.com") (collectively "Defendants"). Based upon personal knowledge, information, and

27   belief, the investigation of counsel, Plaintiff alleges as follows:

28   / / /

## NATURE OF THE ACTION

1.      On or about May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com, a wholly-owned subsidiary of Wal-Mart Stores, entered into an agreement to divide the markets for the sales and online rentals of DVDs in the United States ("Market Division Agreement"), with the purpose and effect of monopolizing and unreasonably restraining trade in at least the Online DVD Rental Market, meaning the market for renting DVDs online by subscription for delivery by mail.

2.      The meetings that led to the conspiracy began in January 2005, when Reed Hastings, the CEO of Netflix, and John Fleming, then the CEO of Walmart.com, met with each other for dinner to discuss the online DVD rental and DVD sales markets and how they could reach an agreement that would reduce or eliminate competition in those markets. According to Hastings, having "noticed how low Wal-Mart's prices [for DVDs] were," he "called the CEO [of Walmart.com] in January and asked if he could have dinner." Fleming, who reported directly to Wal-Mart Stores' CEO Lee Scott, accepted Hastings' invitation. The two thereafter met and, as a result of the meetings and exchanges that followed, Defendants entered into the contract, combination, and conspiracy alleged herein.

3.      At the time of their initial meeting and prior to entering into the Market Division Agreement, Netflix and Walmart.com were direct competitors in renting DVDs online and all three defendants were potential competitors in selling new DVDs to consumers. However, by no later than May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com entered into an agreement by which Walmart.com would stop competing with Netflix in the online DVD rental business, and Netflix would promote the sales of new DVDs by Wal-Mart Stores and Walmart.com, and not sell new DVDs in competition with them.

4.      Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing Officer of Wal-Mart Stores and the Wal-Mart Stores

1  executive responsible for overseeing the operations of Walmart.com. As Chief Marketing Officer

2  of Wal-Mart Stores, Fleming was responsible for deciding "what the largest, most powerful

3  retailer in history will stock on its shelves, and how much those products will cost. Such

4  decisions, when made at Wal-Mart, can help make or break entire industries."

5          5.      Defendants' conspiracy enabled Netflix to charge its customers higher

6  subscription prices for the rental of DVDs than it otherwise would have. As a result of

7  Defendants' contract, combination, and conspiracy as well as Netflix's unlawfully acquired and

8  maintained market and monopoly power, Netflix actually did charge Plaintiff supracompetitive

9  subscription prices for the rental of DVDs, did so for all other persons similarly situated, and

10 continues to do so.

11         6.      Under the Market Division Agreement, Netflix, Wal-Mart Stores, and

12 Walmart.com agreed that they would restrain trade and eliminate competition. Wal-Mart Stores

13 and Walmart.com agreed that Walmart.com would stop competing with Netflix in the Online

14 DVD Rental Market. Netflix agreed that it would not sell new DVDs, but instead would promote

15 the DVD sales of Wal-Mart Stores and Walmart.com. In agreeing to promote the sale of DVDs

16 by Wal-Mart Stores and Walmart.com, Netflix provided consideration for the agreement by Wal-

17 Mart Stores and Walmart.com that Walmart.com would exit the Online DVD Rental Market and

18 simultaneously confirmed to Wal-Mart Stores and Walmart.com that Netflix would not enter the

19 market to sell new DVDs, as Netflix was well-positioned and otherwise had the unilateral

20 economic incentive to do.

21         7.      Since entering into the Market Division Agreement, neither Wal-Mart

22 Stores nor Walmart.com have rented DVDs online, and Netflix has not sold new DVDs. The

23 Market Division Agreement served to entrench and enhance Defendants' dominant market

24 positions and otherwise cause harm to competition, including enabling Netflix to charge

25 supracompetitive subscription prices for online DVD rentals, prices that would have been lower

26 had they not entered into the Agreement. Plaintiff and all other similarly situated direct

27 purchasers in fact paid the higher subscription prices to Netflix.

28

1        8.     As alleged below, this case is brought as a class action on behalf of all

2  persons in the United States who, during the period May 19, 2005, to the present (hereinafter, the

3  "Class Period"), paid a subscription fee to rent DVDs from Netflix.  Plaintiff, on behalf of herself

4  and others similarly situated, brings this action under Sections 4 and 16 of the Clayton Antitrust

5  Act to obtain redress in the form of treble damages for the overcharges she paid resulting from

6  Defendants' violations of law, to obtain a declaration that the Market Division Agreement is null

7  and void, and to enjoin its maintenance.

8                       **PARTIES**

9        9.     Margarita Lacabe ("Plaintiff") is an adult individual residing within this

10  District at 46 Estabrook Street, San Leandro, CA 94577.  During the Class Period, Plaintiff

11  directly subscribed to Netflix and paid Netflix fees in connection therewith.  The subscription fees

12  Plaintiff paid to Netflix for renting DVDs were supracompetitive; they were greater than they

13  would have been but for the antitrust violations alleged herein.

14       10.    Defendant Netflix is a Delaware corporation headquartered within this

15  District at 100 Winchester Circle, Los Gatos, California, 95032.  Netflix is publicly traded on the

16  NASDAQ under the symbol NFLX.  Its revenues earned from engaging in interstate commerce

17  exceed $1 billion annually.  Through its website, www.netflix.com, Netflix rents DVDs directly

18  to consumers nationwide by charging monthly subscription fees, which entitle customers to rent

19  DVDs pursuant to various subscription plans.  Netflix has possessed a market share of at least

20  75% of the Online DVD Rental Market in the United States, as defined herein, at all times during

21  the Class Period.

22       11.    Defendant Wal-Mart Stores is the largest retailer in the United States.

23  Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville,

24  Arkansas, 72716.  Wal-Mart Stores is publicly traded on the New York Stock Exchange under the

25  symbol WMT.  Its revenues earned from engaging in interstate and foreign commerce approach

26  $400 billion annually.  Through its retail stores and its website, www.walmart.com, Wal-Mart

27  Stores sells DVDs directly to consumers nationwide.  Wal-Mart Stores sells far more DVDs than

28  any other retailer in the United States, accounting for about 40% of all new DVDs sold to

1   consumers domestically. Prior to the Market Division Agreement, Wal-Mart Stores' wholly-

2   owned subsidiary Walmart.com competed with Netflix in the Online DVD Rental Market through

3   the "Walmart DVD Rentals" service, which was available on www.walmart.com.

4            12.    Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores.

5   Walmart.com is a Delaware company with its headquarters within this District at 7000 Marina

6   Boulevard, Brisbane, California 94005. It is the online component of Wal-Mart Stores' retail

7   empire that is the leading seller of new DVDs in the United States. Prior to the conspiracy

8   alleged herein, Walmart.com was also a major competitor of Netflix in the Online DVD Rental

9   Market through the "Wal-Mart DVD Rentals" service, which was available on

10   www.walmart.com. While its financials are not publicly reported by Wal-Mart Stores,

11   Walmart.com is ranked as the 14th largest online retailer in the United States. Through its

12   website, www.walmart.com, Walmart.com sells DVDs directly to consumers nationwide.

13   Consumers who purchase DVDs via www.walmart.com may have them either mailed or

14   otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via

15   Walmart.com and Wal-Mart Stores' "Site to Store" program.

16            13.    Walmart.com and Wal-Mart Stores are, in essence, completely integrated

17   and operated as a single commercial enterprise and hold themselves out to the public as such,

18   whereby Walmart.com is an internet sales channel for Wal-Mart Stores, rather than being an

19   independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com domain

20   name that is used to sell products and services by Walmart.com.

21            14.    Likewise, Wal-Mart Stores is the registrant of

22   www.walmartdvdrentals.com.

23            15.    Wal-Mart Stores' Chief Marketing Officer John Fleming has explained the

24   relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-Mart Stores set up

25   Walmart.com as a separate company with some outside investors, but within six months Wal-

26   Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves as a

27   'marketing channel' for Wal-Mart Stores."

28

1        16.    Wal-Mart Stores was actively involved in the conspiracy alleged herein, as

2  alleged more specifically below. For purposes of these allegations, both Wal-Mart Stores and

3  Walmart.com are active participants in the conspiracy, and each is liable for the unlawful conduct

4  alleged herein, with each, among other things, participating in, and benefitting from, the Market

5  Division Agreement. Moreover, Wal-Mart Stores directed, ratified, approved, supported, and

6  otherwise aided and abetted Walmart.com's violations of law.

7        17.    Wal-Mart Stores had a strong incentive to accomplish the Market Division

8  Agreement. In addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores

9  obtains substantial revenues from sales of new DVDs, as well as store traffic resulting in the sales

10  of other goods, which would have been threatened by Netflix's entry into new DVD sales, and

11  which revenues were enhanced by Netflix's promotion of Wal-Mart Stores and WalMart.com

12  through the Market Division Agreement. In a letter submitted to this Court in connection with a

13  prior antitrust case brought against Netflix by other plaintiffs for other alleged violations of law,

14  an assistant general counsel of Wal-Mart Stores, referring specifically to Wal-Mart Stores, wrote

15  of "Wal-Mart's decision to discontinue renting DVDs." Moreover, it was Wal-Mart Stores that

16  announced in part the Market Division Agreement, which identifies Wal-Mart Stores, in the

17  "About" section of the press release. The announcement quoted John Fleming, who was then

18  Chief Marketing Officer of Wal-Mart Stores, regarding the Agreement. It explained that

19  Walmart.com's DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that,

20  more generally, Wal-Mart Stores' "[o]nline merchandise sales are available at

21  www.walmart.com."

22        18.    Whenever reference is made in this Complaint to a statement or transaction

23  of any corporation or entity, the allegation means that the corporation or entity acted by or

24  through its directors, members, partners, officers, employees, affiliates, or agents, while engaged

25  in the management, direction, control, or conduct of the corporation or entity's business and

26  acting within its scope of authority.

27

28

**AGENTS AND CO-CONSPIRATORS**

19.     The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

20.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiffs.

21.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337 and 15 U.S.C. §§ 15 & 26.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 & 26 and pursuant to 28 U.S.C. §1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted business, were headquartered, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

24.     This Court has personal jurisdiction over Defendants because, inter alia, each of the Defendants is headquartered in this State or has, in this State, transacted business, maintained continuous and systemic contacts, purposefully availed itself of the benefits of doing business, and/or committed acts in furtherance of the alleged conspiracy complained of herein.

**INTERSTATE TRADE AND COMMERCE**

25.     Defendants' conduct has taken place within the flow of, and substantially affected the interstate commerce of, the United States. By way of example, Defendants have sold and/or rented DVDs throughout the United States, involving hundreds of millions or billions of

1    dollars in interstate commerce, and used the instrumentalities of interstate commerce, including

2    interstate wires and the U.S. mail, to sell and/or to rent DVDs throughout the United States.

3                              **RELEVANT MARKET**

4           26.    Defendants' market allocation conspiracy is per se illegal and requires no

5    allegation of market definition.

6           27.    For those claims that may require market definition, the relevant market for

7    purposes of these allegations during the Class Period at least is the Online DVD Rental Market in

8    the United States.

9           28.    "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc

10   containing commercially recorded entertainment programs for personal viewing. DVDs are the

11   primary medium by which movies and other recorded entertainment are distributed in the United

12   States. Revenues on DVDs far exceed those generated from box office receipts. In addition,

13   DVDs have become a particularly lucrative means for the distribution of previously-aired

14   television programs, surpassing even television syndication rights as a revenue stream in many

15   instances. As defined herein, "DVD" does not refer to blank Digital Video Discs, which are used

16   to store or record data.

17          29.    At all relevant times, there have been no reasonably interchangeable

18   substitutes for the rental of DVDs online by subscription for delivery by mail, which is

19   differentiated, from both the demand and the supply side, from other methods of DVD

20   distribution channels, as well as other methods of entertainment content delivery.

21          30.    In the Online DVD Rental Market, for a monthly subscription fee, a

22   subscriber may rent DVDs from an online service provider, such as Netflix, Blockbuster Online,

23   or (prior to May 19, 2005) Wal-Mart DVD Rentals. There are no late fees and no due dates, but,

24   within any given plan, the subscriber pays the subscription fee regardless of how many DVDs he

25   or she rents per month. Thus, even a consumer who does not rent a DVD for months still is

26   charged the subscription fee; Netflix CEO Reed Hastings calls this the "gym membership effect."

27          31.    To rent DVDs, consumers fill out a rental "queue" in their online profile,

28   listing in order of preference the DVDs they wish to rent. The DVDs are then sent by the

provider to the consumer's home via U.S. mail. To return the DVD and receive the next DVD in the queue, the consumer inserts the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then mails the next movie on the list to the consumer. The library of titles available from online service providers has grown over time, now ranging near 100,000 DVDs -- often twenty to one-hundred times the selection of titles stocked (not to mention available) at any single video rental store.

32.    From the consumer's perspective, online DVD rentals are a differentiated service that is not reasonably interchangeable with traditional bricks-and-mortar video rental. In traditional video rental from physical stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they are looking for, and pay on a per-DVD basis for their selection(s). After the designated rental period of one or more days, usually depending upon the release date of the DVD, the consumer returns his selection or potentially incurs late fees. During the Class Period as alleged herein, these late fees have accounted for as much as 20% of the revenues in traditional video rental stores; there are no late fees or due dates in the Online DVD Rental Market.

33.    There are numerous other practical indicia of the Online DVD Rental Market's being a relevant product market, distinct from other forms of DVD rental, including:

a.    **Price Competition.** No direct price competition exists between online rental and other forms of DVD rental, whether in-store, kiosk, or video downloading, which are not reasonably interchangeable with online DVD rental. For example, online DVD rentals generally are priced on a monthly subscription basis. Within any given plan, the subscription rate is independent of the number of DVDs the customer actually rents in a month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay- per-view basis. Also, changes in the price of online rentals do not closely track changes in the price of in-store rentals. The pricing of online rentals is generally nationwide in scope and is not affected by local in-store prices and competition. As a result, the pricing of online rentals would generally be the same to a customer, regardless of whether the nearest rental store is two minutes or two hours away. Online rentals generally offer additional services, such as movie reviews, customer-

1  specific recommendations based on viewing and preference history, and other metrics of

2  popularity. The cross-price elasticity of demand between these products is such that a small but

3  significant nontransitory increase in price ("SSNIP") of online DVD rental would not cause

4  consumers to switch from online DVD rental to in-store rental or any other arguable method of

5  DVD distribution, or vice versa.

6          b.    **Functional Differences.** Online rentals fundamentally differ from

7  in-store rentals in that they (1) do not require travel to a store (including a second trip to return the

8  DVD and potentially multiple trips if the store does not have the DVD in stock at the right time),

9  (2) are available to anyone with a postal address, regardless of proximity to a store, (3) are

10  primarily subscription-based services, and (4) provide a much-wider selection of titles than can a

11  brick-and-mortar store. For these reasons, among others, online and in-store DVD rentals are not

12  reasonably interchangeable. Likewise, other modes of content distribution, such as kiosk, video-

13  on-demand, and downloading, among other forms, are not reasonably interchangeable with online

14  DVD rentals for a number of reasons, including relative selection and convenience for consumers,

15  pricing, as well as, from the supply perspective, licensing considerations and technological

16  limitations.

17          c.    **Public and Industry Perceptions.** The online rental market is

18  recognized as a distinct market by the public and the industry, including by Defendants.

19          d.    **Admissions.** By word and deed, Defendants have confirmed and

20  recognized the existence of a discrete online rental market. Admissions of a discrete online rental

21  market abound from Netflix and Walmart.com and Wal-Mart Stores executives alike, including

22  Hastings and Fleming. Very recently, a Netflix executive told the Wall Street Journal that other

23  types of rental services, such as kiosk and in-store rentals, do not present a direct competitive

24  threat to Netflix. That same executive acknowledged that while video downloads may be a

25  competitive force in the future, DVD will be the dominant medium for years to come, making the

26  entry of this technology not timely enough to be considered a competitive force in the relevant

27  market. Netflix CEO Reed Hastings has observed that the competitive threat of internet

28  downloading to online DVD rental during the Class Period is like that of hydrogen powered cars

1  to gasoline powered cars: inconsequential for many years to come. He has further explained that

2  DVDs will be the dominant medium for movies for perhaps as long as the gasoline engine.

3      34.    Online DVD rentals are also a separate market from DVD sales. The

4  pricing of DVD sales and online DVD rentals is very different. For example, the price to buy a

5  new DVD depends heavily on how popular it is, including whether it is a new release or how

6  successful the title originally was at the box office or on television. By contrast, online DVD

7  renters generally charge based on a subscription fee, regardless of whether the consumer is

8  renting popular or obscure DVDs. The industry and the public perceive online DVD rentals as

9  separate from DVD sales, whether in-store or online. The factors motivating a consumer to buy a

10  DVD are different from those that lead to renting a DVD. The former generally applies to DVDs

11  that the consumer intends to view (either personally, or their family or friends) numerous times.

12  The latter generally applies to DVDs that the consumer intends to view once and then return.

13  DVDs sold at retail have other distinguishing characteristics, such as packaging and special

14  features not available with rentals, which are delivered unadorned in envelopes. In addition, the

15  fact of whether a DVD is new or used is not an issue in rental, but is a significant factor in sales,

16  for used DVDs are sold at a significant discount to their new counterparts, due to their being

17  relatively less desirable to consumers. DVD sales and online rentals also are not reasonably

18  interchangeable for consumers intending to collect physical DVDs or to give a DVD as a gift.

19  The cross-elasticity of demand between these products is such that a SSNIP in online DVD rental

20  would not cause consumers to switch from online DVD rental to purchasing DVDs, or vice versa.

21      35.    The Geographic Market for the Online DVD Rental Market is the United

22  States. The practical reality is that, among other things, shipping costs and transglobal

23  differences in DVD data encoding make it neither practical nor feasible for entities located in

24  other countries to rent DVDs to U.S. consumers.

25  **MARKET AND MONOPOLY POWER**

26      36.    At all relevant times, Netflix dominated the Online DVD Rental Market.

27  Netflix has an approximate market share of 75% in the Online DVD Rental Market, and is far and

28  away the market leader in the Online DVD Rental Market. As a result of this market share,

1   Netflix has had and continues to have market and monopoly power in the Online DVD Rental

2   Market. That is, Netflix has the power to control prices and exclude competition in this Relevant

3   Market.

4           37.     Netflix also has the power to control prices or exclude competition in this

5   Relevant Market for other reasons. Specifically, Netflix (a) set subscription prices for online

6   DVD rentals at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c)

7   sold such subscriptions substantially in excess of the competitive price, (d) enjoyed substantial

8   barriers to market entry and growth, and (e) would not, by raising prices for its online DVD rental

9   subscriptions a small but significant nontransitory amount, lose sufficient sales to make such a

10  price increase unprofitable.

11          38.     Netflix's market and monopoly power is strengthened by the significant

12  barriers to entry in this market. There have been no significant market entrants in the more than

13  three years since announcement of the Market Division Agreement, which increased those

14  barriers. Online DVD rental is highly capital intensive. A firm must operate on a large scale to

15  be successful. Entry requires the possession of a significant number of shipping facilities

16  strategically located throughout the United states to ensure timely delivery. It also requires

17  stocking an extensive inventory of DVDs to maintain the selection of titles that consumers

18  demand. As Netflix CEO Reed Hastings has observed, "[w]hen you think about the barriers to

19  entry to this business, it is subtle because it appears easy. A kid can open a website. But the

20  barriers to profitability are very large."

21          39.     Since the implementation of the Market Division Agreement, the Online

22  DVD Rental Market has been overwhelmingly composed of only two firms: Netflix and

23  Blockbuster, the latter of which possesses nearly all of the remaining 25% of the Online DVD

24  Rental Market that Netflix does not control. (A few minor firms have shares of less than 1-2% of

25  the market.) During fiscal years 2005-2007 combined, Netflix earned nearly $4 billion in

26  revenues and $1.3 billion in gross profit from renting DVDs to consumers — a margin of more

27  than 33%. As a result of Netflix's abuse of its monopoly power alleged herein, its subscription

28  fees have been higher than they otherwise would have been.

795824.2                                    - 12 -                    CLASS ACTION COMPLAINT

40. Wal-Mart Stores and its wholly-owned subsidiary Walmart.com also enjoy substantial market and monopoly power. Combined, they have an industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they earned revenues in excess of $25 billion by selling DVDs to consumers. Both Wal-Mart Stores and Walmart.com benefit from the Market Division Agreement.

41. Further evidence of Netflix's market and monopoly power is reflected in the anticompetitive effects alleged herein.

## THE ILLEGAL AGREEMENT

42. **Pre-Agreement Competition in the Online DVD Rental Market.** In early 2005, Netflix was coming off a year in which competition was growing and its stock price had dropped precipitously. It faced increasing competition from Walmart DVD Rentals and from Blockbuster Online, the latter of which had just entered the online rental market.

43. By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan. Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing its price in November to $17.49 for its similar plan. After that, the Walmart DVD Rentals rate was reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced its prices by nearly 20% (to $17.99 per month) soon thereafter. After that, Blockbuster further decreased its price to $14.99 — 20% below Netflix's already reduced price and more than 40% below the price Netflix was charging just months earlier.

44. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had established themselves as the leader in new DVD sales, were facing increasing competition from in-store and online channels of distribution in new DVD sales, including competition from Amazon.com. At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of millions of customers who were known in the industry to be prolific DVD buyers, and the sales and profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional sales and profits and to

- 13 -

1   gain further market share in the sale of new DVDs if these customers were to make their

2   purchases of new DVDs from them instead.

3       45.   **The Walmart Price Cut.**  On January 7, 2005, Walmart DVD Rentals

4   dropped the price on its most popular DVD rental plan significantly— to $12.97 per month —

5   creating further price pressure on Netflix to reduce its DVD rental prices.  In order to respond to

6   the increased competition, Netflix would have been forced to lower its prices and thereby reduce

7   its profits.

8       46.   **The January Dinner Meeting.**  Faced with this increasing competition,

9   Reed Hastings, the chairman and CEO of Netflix, called John Fleming, then the CEO of

10  Walmart.com, and invited him to dinner to discuss the their companies' DVD sales and rentals

11  businesses.  Fleming accepted the invitation; the two met together in January 2005 and embarked

12  upon a scheme that would result in the contract, combination, conspiracy, and agreement

13  reflected in the Market Division Agreement.

14      47.   **Hastings' Subsequent "Prediction."**  On May 5,2005, in Netflix's First

15  Quarter earnings call with financial analysts, held after the January dinner but only two weeks

16  prior to the public announcement of the Market Division Agreement, Hastings made plain the

17  motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

18          In terms of profitability over the coming years, the key issue is the
            number of major competitors.  If there are only two major players,
19          Blockbuster and Netflix, the profitability may be substantial like
            other two-firm entertainment markets.  If, on the other hand,
20          Amazon, Wal-Mart, Blockbuster and Netflix are all major
            competitors in online rental, then the profits would likely be small.
21

22  Hastings went on to "predict" on that conference call:

23          [T]he likely case is [that] online rental becomes a two-firm market
            over the coming years.
24

25      48.   **The Public Announcement.**  On May 19, 2005, shortly after Fleming had

26  been promoted to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press

27  release that revealed the existence of the Market Division Agreement, by which they unlawfully

28

1  divided and allocated the markets for DVD sales and rentals, and did, in fact, create the two-firm
2  market that Hastings sought.

3        49.    **The Media's Reaction.**  The news of the agreement was featured in a
4  number of newspapers and other publications, in articles with aptly colorful titles, such as:

5            •     "Wal-Mart and Netflix Scratch Each Other's Backs,"

6            •     "Truce in DVD-Rental Wars,"

7            •     "Wal-Mart and Netflix: An Alliance," and

8            •     "Wal-Mart Loves Netflix: And Vice-Versa."

9        50.    **The Execution.**  Beginning on May 19, 2005, Walmart.com, as agreed, did
10 in fact exit the online DVD rental business. Walmart.com announced to all of the subscribers to
11 "Walmart DVD Rentals" that it was exiting the online DVD rental business and that those
12 subscribers could be transferred to Netflix. Walmart.com took additional steps to affirmatively
13 implement the Market Division Agreement by adding a prominently-placed link to the Netflix
14 website to encourage customers to transfer their subscriptions to Netflix. Since the date of their
15 joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind
16 down its existing online rental business), neither Walmart.com nor Wal-Mart Stores has
17 participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

18       51.    As a result of the Market Division Agreement, downward pricing pressure
19 from Walmart.com was eliminated and the Online DVD Rental Market was reduced to two
20 competitors. Absent the Market Division Agreement, Netflix would have lowered its prices no
21 later than May 19, 2005. As a result of the elimination of a competitor in this Relevant Market,
22 Blockbuster was able to raise its subscription price in July to match that of Netflix, from $14.99
23 per month to $17.99 per month, in accord with Hastings' expectation that "[i]f there are only two
24 major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm
25 entertainment markets." In Netflix's next earnings call, on August 8, 2005, Hastings boasted:

26           Last quarter we said online rental was shaping up to be a two-player
          market, and that is indeed what is happening.
27

28

795824.2                  - 15 -                        CLASS ACTION COMPLAINT

1    From 2005 through June 2007, Netflix's subscription rates remained unchanged at $14.99 per

2    month for two DVDs at a time, and $17.99 per month for three DVDs at a time.

3          52.    The Market Division Agreement was not in the independent self-interest of

4    Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would

5    have wanted Walmart.com to withdraw from the online rental market, encourage its subscribers

6    to be transferred to Netflix, and promote Netflix's rental business absent substantial consideration

7    from Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market

8    Division Agreement, Walmart.com would not have exited the Online DVD Rental Market when it

9    did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of

10   subscribers — a base of customers who purchase on average 25 DVDs per year each — and

11   would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its

12   own sales, absent an agreement from those entities not to compete against Netflix's online DVD

13   rental business.

14                                **ANTICOMPETITIVE EFFECTS**

15         53.    Defendants' illegal acts and practices have caused anticompetitive effects

16   in the Online DVD Rental Market. The subscription fees charged by Netflix to Plaintiff, as well

17   as the other members of the Class, were maintained at artificially high and supracompetitive

18   levels. Plaintiff and the other members of the Class paid higher subscription prices to Netflix

19   than they otherwise would have paid but for the Market Division Agreement.

20         54.    The Market Division Agreement (i) eliminated one of only three significant

21   competitors in the Relevant Market, (ii) eliminated competition between Defendants, and (iii)

22   enabled Netflix to acquire market power and also acquire and maintain monopoly power in the

23   Relevant Market. The Market Division Agreement has enabled Netflix to implement

24   monopolistic and supracompetitive pricing in the Relevant Market.

25         55.    The Market Division Agreement and Defendants' acts and practices in

26   furtherance thereof have no procompetitive benefits. They do not create information that

27   consumers need, nor do they create new or better products or services. Rather, they have served

28   to reinforce the true anticompetitive nature of the Market Division Agreement by assuring, for

795824.2                              - 16 -                    CLASS ACTION COMPLAINT

1  example, that Walmart.com not only withdrew from the Online DVD Rental Market, but further

2  enhanced Netflix's position in that market. Even if there were any procompetitive benefits, they

3  would not outweigh any of the anticompetitive effects described herein, and, in any event, could

4  be achieved by less restrictive means.

5  ## CLASS ACTION ALLEGATIONS

6         56.    Plaintiff brings this action on her own behalf and as class action under

7  Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all

8  members of the Class, as defined herein.

9         57.    Plaintiff brings this action on behalf of herself and the members of the

10  Class, defined as comprising:

11             Any person in the United States that paid a subscription fee to
               Netflix to rent DVDs, on or after May 19, 2005 up to the present.
12             Excluded from the Class are government entities, Defendants, their
               co-conspirators and their representatives, parents, subsidiaries, and
13             affiliates.

14         58.    The Class numbers in the millions, the exact number and identities of the

15  members being known by Defendants.

16         59.    The Class is so numerous and geographically dispersed that joinder of all

17  members is impracticable.

18         60.    There are questions of law and fact common to the Class and the members

19  thereof. These common questions relate to the existence of the conspiracy alleged, and to the

20  type and common pattern of injuries sustained as a result thereof. The questions include, but are

21  not limited to:

22             a.     whether Defendants engaged in a contract, combination, or

23  conspiracy to allocate markets;

24             b.     whether Defendants unreasonably restrained trade in the Online

25  DVD Rental Market;

26             c.     whether Defendants had the specific intent for Netflix to

27  monopolize the Online DVD Rental Market;

28

795824.2                          - 17 -                  CLASS ACTION COMPLAINT

1                 d.      the nature and character of the acts performed by Defendants in the

2 furtherance of the alleged contract, combination, and conspiracy;

3                 e.      whether the alleged contract, combination, and conspiracy violated

4 Section 1 of the Sherman Act;

5                 f.      whether the alleged contract, combination, and conspiracy violated

6 Section 2 of the Sherman Act;

7                 g.      the anticompetitive effects of Defendants' violations of law;

8                 h.      whether Defendants have acted or refused to act on grounds

9 generally applicable to the Class, thereby making appropriate final injunctive relief or

10 corresponding declaratory relief with respect to the Class as a whole; and

11                 i.      whether the conduct of Defendants, as alleged in this Complaint,

12 caused Netflix subscription fees to be higher than they otherwise would have been and thereby

13 caused injury to the business and property of Plaintiff and other members of the Class.

14        61.      The questions of law and fact common to the members of the Class

15 predominate over any questions affecting only individual members, including the legal and

16 factual issues relating to liability and damages.

17        62.      Plaintiff is a member of the Class. Her claims are typical of the claims of

18 other members of the Class, and she will fairly and adequately protect the interests of the

19 members of the Class. Her interests are aligned with, and not antagonistic to, those of the other

20 members of the Class.

21        63.      Plaintiff is represented by competent counsel experienced in class action

22 antitrust litigation.

23        64.      A class action is superior to other available methods for the fair and

24 efficient adjudication of this controversy. Class treatment will permit the adjudication of

25 relatively small claims by members of the Class who otherwise could not afford to litigate

26 antitrust claims such as are asserted in this Complaint. This class action presents no difficulties of

27 management that would preclude its maintenance as a class action.

28

1

## ANTITRUST INJURY AND STANDING

2    65.    During the Class Period, Plaintiff and the members of the Class have

3  directly paid monthly DVD subscription fees to Netflix in the United States, and many continue

4  to do so. Plaintiff and the members of the Class have suffered, and many continue to suffer,

5  injury of the type that the antitrust laws are designed to punish and prevent. Plaintiff and the

6  members of the Class have paid, and many continue to pay, more to subscribe to Netflix than they

7  would have, absent the Market Division Agreement. As a direct and proximate result of the

8  unreasonable restraint of trade and market and monopoly power created by the Market Division

9  Agreement, Plaintiff and the members of the Class were, and many continue to be, injured and

10  financially damaged in their businesses and property, in amounts that are not presently

11  determined. As direct purchasers and the direct victims of Defendants' antitrust violations,

12  Plaintiff are the most efficient enforcers of the antitrust claims made herein.

13    ## COUNT ONE

14    ### SHERMAN ACT SECTION ONE (15 U.S.C. § 1)
      #### Illegal Market Division
15    #### (Against All Defendants)

16    66.    Plaintiff realleges each allegation set forth above, as if fully set forth

17  herein.

18    67.    Defendants have entered into a per se illegal market division agreement, in

19  violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

20    68.    Even if evaluated under the Rule of Reason, the Market Division

21  Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust

22  Act, 15 U.S.C. § 1, in that it constitutes a contract, combination and conspiracy that substantially,

23  unreasonably, and unduly restrained, and continues to restrain, trade in the relevant market, and

24  harmed, and continues to harm, Plaintiff and the other members of the Class thereby.

25    69.    Defendants, and each of them, possessed market power at all relevant

26  times.

27    70.    Prior to and at the time of the agreement, Netflix and Walmart.com were

28  actual competitors in the Online DVD Rental Market. In addition, Netflix, on the one hand, and

1    Wal-Mart Stores and Walmart.com, on the other hand, were potential competitors in new DVD

2    sales. Wal-Mart Stores and Walmart.com were actual participants and Netflix was a potential

3    participant, with the means and economic incentive to sell new DVDs — in the absence of the

4    Market Division Agreement.

5             71.    Defendants shared a conscious commitment to a common scheme designed

6    to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD

7    sales. The Market Division Agreement allocated the Online DVD Rental Market to Netflix, with

8    Wal-Mart Stores and Walmart.com agreeing not to compete in that Relevant Market. The

9    agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix

10   agreeing to refrain from selling new DVDs in competition with them. In addition to explicitly or

11   de facto agreeing not to sell new DVDs, Netflix also obtained the Market Division Agreement by

12   providing potentially valuable promotion to Wal-Mart Stores and Walmart.com. In so doing,

13   Netflix provided significant consideration to Wal-Mart Stores and Walmart.com for their

14   agreement that Walmart.com would withdraw from, and both Walmart.com and Wal-Mart Stores

15   would not compete in, the Online DVD Rental Market.

16            72.    The Market Division Agreement has created significant anticompetitive

17   effects and no procompetitive benefits. It eliminated competition in the Relevant Market, raising

18   prices paid by consumers. There is no legitimate, procompetitive business justification for the

19   Market Division Agreement that outweighs its harmful effect. To the extent that there are any

20   procompetitive benefits at all resulting from the agreement, they would not outweigh the

21   agreement's anticompetitive effects. In any event, to the extent that there were any,

22   procompetitive benefits could have been achieved by less restrictive means.

23            73.    As a result of this violation of law, Netflix's subscription prices charged to,

24   and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have

25   been.

26   / / /

27   / / /

28   / / /

795824.2                              - 20 -                    CLASS ACTION COMPLAINT

1

2
3

## COUNT TWO

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Monopolization of Online DVD Rental Market**
**(Against Netflix)**

4    74.    Plaintiff realleges each allegation set forth above, as if fully set forth

5    herein.

6    75.    Netflix has monopoly power in the Online DVD Rental Market.

7    76.    Netflix willfully acquired and maintained its monopoly power in the

8    Online DVD Rental Market by its acts and practices described herein, including by executing,

9    implementing, and otherwise complying with the Market Division Agreement, in violation of

10    Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

11    77.    By the Market Division Agreement, Netflix willfully maintained its

12    monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by

13    means of greater business acumen, and injured Plaintiff thereby.  It was Netflix's conscious

14    object to further its dominance in the relevant market by and through the Market Division

15    Agreement.

16    78.    As a result of this violation of law, Netflix's subscription prices charged to,

17    and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have

18    been.

19    ## COUNT THREE

20
21

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Attempt to Monopolize Online DVD Rental Market**
**(Against Netflix)**

22    79.    Plaintiff realleges each allegation set forth above, as if fully set forth

23    herein.

24    80.    If Netflix does not already have monopoly power, then Netflix has a

25    dangerous probability of success in achieving monopoly power in the Online DVD Rental

26    Market.

27    81.    With the specific intent to achieve monopoly power in the relevant market,

28    Netflix, by its acts and practices described herein, including by executing, implementing, and

795824.2                              - 21 -                    CLASS ACTION COMPLAINT

1 otherwise complying with the Market Division Agreement, has attempted to monopolize the

2 Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C.

3 § 2.

4      82.    It was Netflix's conscious object to control prices and/or to exclude

5 competition in the relevant market.

6      83.    The natural and probable consequence of the Market Division Agreement,

7 which was plainly foreseeable to Netflix, was to give Netflix control over prices and/or to exclude

8 or destroy competition in all or some of the relevant market, to the extent Netflix has not already

9 succeeded.

10      84.    There is a substantial and real chance, a reasonable likelihood, and/or a

11 dangerous probability that Netflix will succeed in and achieve its goal of obtaining monopoly

12 power in the relevant market.

13      85.    As a result of this violation of law, Netflix's subscription prices charged to,

14 and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have

15 been.

16                    **COUNT FOUR**

17                **SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
       **Conspiracy to Monopolize Online DVD Rental Market**
18                  **(Against All Defendants)**

19      86.    Plaintiff realleges each allegation set forth above, as if fully set forth

20 herein.

21      87.    Defendants shared a conscious commitment to a common scheme designed

22 to achieve the unlawful objective of the monopolization of the Online DVD Rental Market.

23      88.    Prior to and at the time of the agreement, Netflix and Walmart.com were

24 actual competitors in the Online DVD Rental Market.

25      89.    Defendants conspired with the specific intent, knowledge, and purpose that

26 their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a

27 monopoly in the Relevant Market.

28

90.     Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix, and thereby injury to Plaintiff and others similarly situated.

91.     Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

92.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## ENTITLEMENT TO INJUNCTIVE RELIEF

93.     Plaintiff realleges each allegation set forth above, as if fully set forth herein.

94.     Defendants' conduct is ongoing, likely to recur, and, unless enjoined, will continue into the future, causing irreparable further injury to Plaintiff's business and property.

95.     Plaintiff prays that the Court enjoin the Market Division Agreement pursuant to 15 U.S.C. § 26.

## PRAYER FOR RELIEF

96.     WHEREFORE, Plaintiff respectfully requests that:

a.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class.

b.      Defendants be adjudged to have violated Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2.

c.      The Court declare the Market Division Agreement between Defendants, announced May 19, 2005, to be unlawful and null and void.

d.      Judgment be entered for Plaintiff and the members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15,

1   together with pre- and post-judgment interest, the costs of the action, including litigation expenses

2   and reasonable attorneys' fees, and such other relief as is appropriate.

3                    e.      Defendants, their affiliates, successors, transferees, assignees, and

4   the officers, directors, partners, agents and employees thereof, and all other persons acting or

5   claiming to act on their behalf, be permanently enjoined and restrained from, in any manner,

6   continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or

7   from engaging in any other contract, combination or conspiracy having similar purpose or effect,

8   and from adopting or following any practice, plan, program or device having a similar purpose or

9   effect, pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 26.

10                   f.       Plaintiff and the members of the Class have such other, further, and

11  different relief as the case may require and the Court may deem just and proper under the

12  circumstances.

13  Dated: January 28, 2009      Respectfully submitted,

14                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

15

16                              By:                        
                                     Joseph R. Saveri

17                              Joseph Saveri (State Bar No. 130064)
                                *jsaveri@lchb.com*

18                              Michele C. Jackson (State Bar No. 090807)
                                *mjackson@lchb.com*

19                              Eric B. Fastiff (State Bar No. 182260)
                                *efastiff@lchb.com*

20                              Andrew S. Kingsdale (State Bar No. 255669)
                                *akingsdale@lchb.com*

21                              Lieff Cabraser Heimann & Bernstein, LLP
                                275 Battery Street, Suite 3000

22                              San Francisco, CA 94111-3339
                                Tel: (415) 956-1000

23                              Fax: (415) 956-1008

24                              *Attorneys for Individual and Representative Plaintiff Margarita*
                                *Lacabe*

25

26

27

28

795824.2                          - 24 -                       CLASS ACTION COMPLAINT

1  **JURY DEMAND**

2  Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a

3  jury trial.

4  Dated: January 28, 2009           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

5
                                    By: _____
6                                        Joseph R. Saveri

7                                   Joseph Saveri (State Bar No. 130064)
                                    *jsaveri@lchb.com*
8                                   Michele C. Jackson (State Bar No. 090807)
                                    *mjackson@lchb.com*
9                                   Eric B. Fastiff (State Bar No. 182260)
                                    *efastiff@lchb.com*
10                                  Andrew S. Kingsdale (State Bar No. 255669)
                                    *akingsdale@lchb.com*
11                                  Lieff Cabraser Heimann & Bernstein, LLP
                                    275 Battery Street, Suite 3000
12                                  San Francisco, CA 94111-3339
                                    Tel: (415) 956-1000
13                                  Fax: (415) 956-1008

14                                  *Attorneys for Individual and Representative Plaintiff Margarita
                                    Lacabe*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

795824.2                          - 25 -                    CLASS ACTION COMPLAINT